1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PAUL M. MIDDERIGH,

              Plaintiff,

      v.

MICHAEL J. ASTRUE[1], Commissioner of
Social Security,

              Defendant.

CASE NO.    C06-5590KLS

ORDER REMANDING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS

Plaintiff, Paul M. Midderigh, has brought this matter for judicial review of the denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.  The parties have

consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13.  After reviewing the parties'

briefs and the remaining record, the undersigned hereby finds and ORDERS as follows:

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 44 years old.[2] Tr. 33.  He has an eleventh grade education and past work

experience as a manufacturing laborer, janitor and shipper. Tr. 20, 94, 99, 102.

---

     [1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who recently became acting Commissioner of Social Security, hereby automatically is substituted for Joanne B. Barnhart.

     [2]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

1   On March 31, 2003, plaintiff filed applications for disability insurance and SSI benefits, alleging

2   disability as of April 1, 2002, due to hepatitis C, depression, anxiety, back and chest pains, a sleep disorder,

3   high blood pressure, and substance abuse in remission. Tr. 19, 93.  His applications were denied initially and

4   on reconsideration. Tr. 33-35, 41, 353-54, 358-59.  A hearing was held before an administrative law judge

5   ("ALJ") on November 8, 2005, at which plaintiff, represented by counsel, appeared and testified. Tr. 363-

6   78.

7   On April 7, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding

8   specifically in relevant part:

9       (1)    at step one of the sequential disability evaluation process,[3] plaintiff had not
              engaged in substantial gainful activity since his alleged onset date of disability;

10

11      (2)    at step two, plaintiff had "severe" impairments consisting of obesity, diabetes,
              hepatitis C, and depression;

12      (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of
              those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

13

14      (4)    at step four, plaintiff had the residual functional capacity to perform a modified
              range of light work, which precluded him from performing his past relevant
              work; and

15

16      (5)    at step five, plaintiff was capable of performing other jobs existing in significant
              numbers in the national economy.

17  Tr. 31-32.  Plaintiff's request for review was denied by the Appeals Council on August 21, 2006, making

18  the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981, § 416.1481.

19  On October 13, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision.

20  (Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of

21  benefits or, in the alternative, for further administrative proceedings, for the following reasons:

22      (a)    the ALJ erred in finding plaintiff's diagnosed post traumatic stress disorder
              ("PTSD") to be not severe;

23

24      (b)    the ALJ erred in evaluating the medical evidence in the record;

25      (c)    the ALJ erred in assessing plaintiff's credibility; and

26      (d)    the ALJ erred in finding plaintiff capable of performing other work existing in
              significant numbers in the national economy.

27

28  _____

    [3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled.
See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the
disability determination is made at that step, and the sequential evaluation process ends. Id.

1
2       The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set
3       forth below, hereby finds that while the ALJ's decision should be reversed, this matter should be remanded
4       to the Commissioner for further administrative proceedings.

                                    DISCUSSION
5
6               This Court must uphold the Commissioner's determination that plaintiff is not disabled if the
        Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to
7
        support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is
8
        such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson
9
        v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than
10
        a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.
11
        1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than
12
        one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d
13
        577, 579 (9th Cir. 1984).
14
        I.      The ALJ Erred in Finding Plaintiff's Post Traumatic Stress Disorder to Be Not Severe
15
16              At step two of the sequential disability evaluation process, the ALJ must determine if an impairment
        is "severe."  Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or
17
        physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c);
18
        Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and
19
        aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856
20
        *3.
21
22              An impairment is not severe only if the evidence establishes a slight abnormality that has "no more
        than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.
23
        Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff
24
        has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work
25
        activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,
26
        601 (9th Cir. 1998).  The step two inquiry described above, however, is a de minimis screening device used
27
        to dispose of groundless claims.  Smolen, 80 F.3d at 1290.
28
                Plaintiff argues the ALJ improperly found his PTSD to be non-severe, criticizing in particular his

evaluation of the opinions of Deborah Haynes, M.D., a treating psychiatrist, regarding that condition.  With

respect to plaintiff's PTSD, the ALJ found generally in relevant part as follows:

> [T]here is little evidence on which a diagnosis of PTSD is based, namely a single report
> of intrusive thoughts of past abuse and some reports of nightmares.  As such, I do not
> find the necessary objective medical evidence from which PTSD could [sic] diagnosed,
> much less be labeled severe.

Tr. 25-26.  In regard to Dr. Haynes' diagnoses of PTSD, the ALJ more specifically determined that:

> I assign little weight to her diagnosis of PTSD, as the longitudinal record does not
> support such a diagnosis.  While the claimant reported some previous nightmares, no
> other typical diagnostic criteria appears in the record prior to the date of this evaluation;
> it was not until this date that the claimant alleged "intrusive thoughts" from past abuse,
> etc. . . .
>
> Despite a full year gap, Dr. Haynes filled out another DSHS questionaire in March 2004.
> Ex. 8F. 3-5.  She again indicted a diagnosis of PTSD, as well as diagnoses of depression
> and methamphetamine abuse, yet, the record still did not evidence the diagnostic criteria
> for PTSD beyond the single subjective report of intrusive thoughts.

Tr. 23.  The undersigned agrees that the ALJ erred both in evaluating the PTSD diagnoses provided by Dr.

Haynes and in finding that condition to be not severe.

It appears plaintiff began seeing Dr. Haynes for psychiatric treatment in late September 2002. See

Tr. 243.  In late February, 2003, Dr. Haynes completed a psychological/psychiatric evaluation form, in

which she diagnosed plaintiff with "delayed" PTSD, major depression, and methamphetatime abuse in six-

month remission. Tr. 224.  Based on these diagnosed conditions, she found plaintiff to be markedly limited

in his ability to respond appropriately to and tolerate the pressures and expectations of a normal work

setting. Tr. 225.  Dr. Haynes also found him to be moderately limited in his ability to: understand, remember

and follow complex instructions; learn new tasks; exercise judgment and make decisions; relate

appropriately to co-workers and supervisors; and interact appropriately in public contacts. Id.

Dr. Haynes further commented that plaintiff had not shown any significant changes since his last

visit, which appears to have been in late November 2002, and that he was "[s]till showing poor judgment in

social situations." Tr. 225, 235.  She noted that he "had more stability in the past 6 months than many years

previous," but still had significant problems with social interpretation. Tr. 226.  Nevertheless, she felt that

mental health treatment was likely to restore or substantially improve his ability to work for pay in a regular

and predictable manner, and that although he had had "mild improvement in irritability," he was likely to

remain impaired to the degree noted above for up to 12 months. Id.

1      In early March 2004, Dr. Haynes completed another psychological/psychiatric evaluation form, in

2 which she diagnosed plaintiff with "PTSD – delayed Type," recurrent moderate major depression and

3 methamphetamine abuse, with a history of being clean for 20 months. Tr. 200. The mental functional

4 limitations Dr. Haynes found were essentially the same as those she found in late February 2003, except that

5 this time she opined that he was markedly limited in his ability to exercise judgment and make decisions and

6 to relate appropriately to co-workers and supervisors. Tr. 201. Once more, Dr. Haynes felt that mental

7 health treatment was likely to restore or substantially improve plaintiff's ability to work for pay in a regular

8 and predictable manner, and that he had been "more stable." Tr. 202. However, she believed it might "take

9 a specialized job setting" where he was "not required to interact with others," and that again he would

10 continue to have the limitations noted above for up to 12 months. Id.

11      Plaintiff argues that contrary to the ALJ's findings, Dr. Haynes noted on more than one occasion

12 that he had symptoms of PTSD, including all of the following: recurrent intrusive thoughts; nightmares;

13 sleep problems; difficulties concentrating; feelings of detachment; restricted affect; irritability; outbursts of

14 anger; and mild paranoia. However, plaintiff has not presented any authority to the Court – medical, legal

15 or otherwise – to show that these are the symptoms that need to be shown in order to constitute a diagnosis

16 of PTSD. Indeed, many, if not all, of them may be symptoms of other mental conditions, such as anxiety

17 and depression. Thus, it is not clear the longitudinal record supports Dr. Haynes' diagnoses.

18      On the other hand, the ALJ – and defendant for that matter – also has failed to provide the Court

19 with any legal, medical or other authority as to what the "typical diagnostic criteria" for PTSD are. The

20 Court is not a medical expert. Accordingly, the determination of whether certain symptoms are or are not

21 typical PTSD symptoms or criteria is not an appropriate one for it to make. Nor is it one for the ALJ to

22 make. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987)

23 (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary of

24 Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own

25 judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ is not

26 free to set own expertise against that of physician who testified before him).

27      Certainly, the ALJ is free to weigh the evidence in the record and choose "between properly

28 submitted medical opinions." Gober, 574 F.2d at 777. However, the ALJ may not base his determination

ORDER
Page - 5

1  on "his own expertise," as appears to have been the case here. See Whitney v. Schweiker, 695 F.2d 784,

2  788 (7th Cir. 1982) (ALJ should avoid commenting on meaning of objective medical findings without

3  supporting medical expert testimony).

4       It is true that the ALJ also may reject the opinion of a treating physician if it is brief, conclusory, and

5  inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of

6  Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947,

7  957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  Here, however, the ALJ

8  cites to no other medical source in the record for the proposition that the treatment and other notes and

9  findings made by Dr. Haynes were inadequate to support a PTSD diagnosis.  Indeed, Dr. Haynes was not

10  the only medical source in the record to diagnose plaintiff with this condition.

11      In late January 2005, Terilie Wingate, Ph.D., an examining psychologist, also diagnosed plaintiff

12  with PTSD, as well as a recurrent major depressive disorder, polysubstance abuse in full remission, and

13  borderline personality traits. Tr. 260.  Dr. Wingate too found plaintiff to be moderately to markedly limited

14  in several mental functional areas because of these conditions. Tr. 261.  While the ALJ did mention Dr.

15  Wingate's findings in his decision, and even stated that he was taking some of them into consideration in

16  assessing plaintiff's residual functional capacity, he did not at all address the PTSD diagnosis she provided

17  or the fact that she provided it. See Tr. 28-29.

18      Accordingly, the undersigned finds the ALJ erred in rejecting Dr. Hayne's PTSD diagnoses.  The

19  ALJ also appears to have erred in finding that diagnosed condition to be non-severe.  As noted above, the

20  step two determination is a de minimis screening device used to dispose of groundless claims.  At this step,

21  furthermore, an impairment will be found not severe only if the evidence establishes a slight abnormality that

22  has no more than a minimal effect on the claimant's ability to work.  As discussed above, plaintiff was found

23  to have a number of significant mental functional limitations by two medical sources, who appear to have

24  based those limitations at least in part on a diagnosis of PTSD.  Such limitations clearly likely would have

25  more than a minimal effect on plaintiff's ability to work.  Thus, because of this and the ALJ's error in

26  rejecting the diagnosis of PTSD, the ALJ should have found that condition to be severe.

27  II.    The ALJ's Evaluation of the Other Medical Evidence in the Record

28      The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." <u>Id.</u> at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson</u>, 359 F.3d at 1195; <u>Thomas</u>, 278 F.3d at 957; <u>Tonapetyan</u>, 242 F.3d at 1149.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

ORDER
Page - 7

A.    <u>Dr. Haynes</u>

Plaintiff argues the ALJ erred in rejecting the significant mental functional limitations Dr. Haynes noted in the two evaluation forms she completed, simply for the reason that Dr. Haynes noted he was doing "fairly well" in several of her treatment notes.  The portion of the ALJ's decision to which plaintiff refers actually is much more detailed, and reads in relevant part as follows:

> In February 2003, Dr. Haynes indicated that the claimant experienced marked limitations regarding his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting, as well as numerous moderate limitations particularly regarding social functioning. Ex. 8F. 26.

> However, she opined that he was able to understand, remember, and follow simple instructions at that time, and that such other impairment would last no more than 12 months.  In fact, at the time Dr. Haynes completed this evaluation the claimant had reported an increase in symptomatology which may be attributable to his stoppage of mental health medications the month previously, but reported the following month that he had been doing "fairly well," even joining a hepatitis C support group. Ex. 8F. 16, 37. Thus, while I have assessed some limitations regarding working with the public and tolerance of stress, considering the longitudinal record, particularly the time that Dr. Haynes completed this questionaire, I have not adopted her opinion in its entirety.

> A year after Dr. Haynes' treatment notes of the claimant stop, in March 2004, she filled out another DSHS [psychological/psychiatric evaluation] questionaire. Ex. 8F. 3-5.  She indicated additional "marked" symptoms and limitations compared to the previous questionaire, however, there is no indication of a worsening of the claimant's mental condition. Ex. 8F. 3-5.  In fact, her most recent treatment notes, from a year prior, indicate that the claimant reported he was "doing fairly well," though he felt some loneliness when his roommate moved out after a conflict, and that the claimant was going to a hepatitis C support group. Ex. 8F. 16. Thus, I assigned this opinion little weight.

Tr. 28.  The undersigned agrees, however, that the ALJ's stated reasons for rejecting Dr. Haynes' opinions in their entirety were insufficient.

The ALJ's evaluation of Dr. Haynes' opinions here suffers from the same problem as his analysis of her diagnoses of PTSD.  That is, the ALJ appears to be improperly substituting his own lay opinion for that of a qualified medical source.  The fact that plaintiff may have reported doing "fairly well" one time shortly before Dr. Haynes completed her late February 2003 evaluation, does not alone call into question the findings contained therein.  Indeed, it appears that in the mid-February 2003 treatment note the ALJ cites to, plaintiff actually was addressing at least in part his physical, as opposed to mental, problems and symptoms. <u>See</u> Tr. 213.  In addition, it also appears Dr. Haynes performed a mental status examination on the same date she completed the evaluation form. <u>See</u> Tr. 227-29.  The ALJ's postulation that plaintiff's increase in symptomatology may have been due to the stoppage of medication, furthermore, appears to be

1   just that, a postulation.  Again, the ALJ is not a medical expert, and no direct support for his guess as to the

2   cause of the symptom increase other than the one treatment note is noted.  See Tr. 235.

3         As to the ALJ's evaluation of Dr. Haynes' later evaluation, it is true that there appears not to be any

4   treatment notes for the period since the prior evaluation was completed.  However, the ALJ again seems to

5   fail to note that the later evaluation was based at least in part on a mental status examination performed at

6   the same time. See Tr. 201.  Thus, even if it could be said to have been a valid reason for the ALJ to have

7   questioned Dr. Haynes' findings based on the most recent treatment note contained in the record, he seems

8   not to have compared that note with these even more recent mental status findings.  The same is true with

9   respect to the ALJ's statement that there was no indication of a worsening of plaintiff's mental condition

10  during that time period.  As such, the undersigned finds the ALJ did not give adequate reasons for rejecting

11  Dr. Haynes' findings here as well.

12        B.     Dr. Wingate

13        Plaintiff argues the ALJ failed to provide any reasons for rejecting the several marked and moderate

14  mental functional limitations contained in Dr. Wingate's late January 2005 psychological evaluation.  With

15  respect to that evaluation, the ALJ found specifically as follows:

16        [Dr. Wingate] indicated "marked" limitations regarding the claimant's ability to interact
          appropriately in public contact and to respond appropriately to and tolerate the pressure
17        and expectations of a normal work-setting. Ex. 10F. 3.  The residual functional capacity
          finding above includes consideration of such limitations . . .
18
19  Tr. 28-29.  The ALJ's assessment of plaintiff's residual functional capacity in turn reads as follows:

20        [T]he claimant retains the residual functional capacity to lift and/or carry 20 pounds
          occasionally, and 10 pounds frequently; stand and/or walk six hours in an eight hour
21        workday; sit six hours in an eight hour workday; and push and/or pull without
          limitations.  Additionally, despite his mental impairment, the claimant is capable of
22        performing simple repetitive tasks and some complex tasks that may include cooperation
          with supervisors on a full time basis away from the public in a setting not involving high
23        stress.

24  Tr. 27.  The undersigned agrees the ALJ did not provide valid reasons for not adopting all of the marked to

25  moderate mental functional limitations found by Dr. Wingate.

26        It does appear that the ALJ did adopt some of Dr. Wingate's limitations.  For example, the ALJ's

27  determination that plaintiff should be away from the public and could perform only some complex tasks

28  seems to have taken into account Dr. Wingate's findings that plaintiff was markedly limited in his ability to

    interact appropriately in public contacts and moderately limited in his ability understand, remember and

ORDER
Page - 9

follow complex tasks.  On the other hand, the ALJ's determination that plaintiff should not be in a setting involving high stress[4] does not necessarily fully encompass the marked limitation regarding responding to and tolerating the pressures and expectations of a normal work setting.  In addition, no mention was made by the ALJ of the other moderate limitations found by Dr. Wingate.

C.    Dr. Kliewer

In late February 2003, Peter Kliewer, M.D., a treating physician, completed a physical evaluation form, in which he opined that plaintiff had the residual functional capacity to perform sedentary work at least half-time in a normal day to day work setting.[5] Tr. 220.  He also found that there were indications of limitation with respect to range of motion and that plaintiff's fatigue limited his ability to do "prolonged work." Id.  Dr. Kliewer further found plaintiff would remain so limited for at least six weeks. Id.  In late February 2004, Dr. Kliewer completed another physical evaluation form, in which he again limited plaintiff's overall work level to sedentary. Tr. 206.  In addition, Dr. Kliewer found that plaintiff was specifically restricted with respect to balancing, bending, crouching and stooping, and that without medical treatment he would remain so limited for at least 12 months. Tr. 206, 208.

The ALJ made the following findings regarding Dr. Kliewer's opinions:

> The exertional limitation to light work is predicated on the claimant's severe impairments of obesity, diabetes, and hepatitis C, according him the benefit of the doubt. I note that this finding is consistent with the opinion of the claimant's treating physician, Dr. Kliewer of February 2003. Ex. F. 22. While there is a later opinion by Dr. Kliewer, of February 2004, that the claimant was limited to sedentary work, I do not find it persuasive. Ex, 8F. 8-9.  Such a conclusion is not supported by Dr. Kliewer's own ratings on the preceding page, nor by the longitudinal record. Ex. 8F. 8-9.

> Furthermore, the record indicates that the date Dr. Kliever last regularly treated the claimant was in September 2003. Ex. 8F. 12.  Finally, the claimant's subsequent treating physician, Dr. [Thomas T.] Siler, opined in February 2005 that the claimant's "chronic problems" were "treated and stable," and that the claimant was capable of light work. Ex. 15F. 6-7.

---

[4]This restriction, as well as the other mental functional limitations adopted by the ALJ, does appear to be consistent with the findings provided by Janis Lewis, Ph.D. See Tr. 190-91.  The ALJ, however, did not explain why he chose to adopt those limitations over those found by Dr. Wingate, an examining physician.

[5]The evaluation form Dr. Kliewer filled out contains boxes to check indicating whether the claimant is able to do heavy, medium, light or sedentary work, or whether the claimant is severely limited in performing work. See Tr. 220.  Both the boxes for light work and sedentary work have been marked in this case. Id.  As discussed in further detail below, the ALJ found Dr. Kliewer's opinion here to be consistent with his own determination that plaintiff was limited to light work. See Tr. 29.  In other words, the ALJ appears to have read the evaluation form as indicating Dr. Kliewer's intent was to check the light work box. Plaintiff, however, reads that form as limiting him to sedentary work.  It does appear that the box for light work has been crossed out, and the box for sedentary work checked in its place.  Accordingly, the undersigned adopts plaintiff's interpretation here.

1   Tr. 29.  Plaintiff argues these findings are inadequate, asserting the ALJ merely stated that he was finding

2   Dr. Kliewer's opinion regarding sedentary work unpersuasive, because it was unsupported by the record.

3   The undersigned disagrees.

4          First, as clearly can be seen, the ALJ's findings were much more specific than this.  For example, he

5   noted that the mild to moderate severity ratings Dr. Kliewer gave plaintiff's diagnosed impairments did not

6   warrant the more severe limitation to sedentary work.  See Tr. 206-07; see also Tr. 218.  The ALJ's finding

7   on this issue is not necessarily erroneous, as, except for "severely limited" finding, sedentary work is the

8   most restrictive limitation that can be imposed by the evaluation forms completed by Dr. Kliewer.  See Tr.

9   206, 220.  The ALJ further correctly noted the longitudinal record concerning plaintiff's physical

10  impairments and limitations also did not warrant a limitation to sedentary work.

11         Dr. Kliewer's own treatment notes, for example, indicate fairly benign findings overall, and do not

12  point to any significant work-related limitations being found therein.  See Tr. 169, 209, 211-12, 214, 217,

13  230-31, 233-34, 236-37, 239, 242, 244-46.  Progress notes from other treatment providers in the record

14  also show little, if any, indication of such limitations.  See Tr. 247, 269-71, 276-77, 283-84, 286-89, 291-92,

15  298-300, 308, 338-44.  Further, two medical sources other than Dr. Kliewer found plaintiff capable of

16  performing within the light range of work, including plaintiff's subsequent treating physician, Dr. Siler, as

17  found by the ALJ.  See Tr. 192-97, 310-04.  Thus, the record contained sufficient evidence upon which the

18  ALJ could base his rejection of Dr. Liewer's sedentary work limitation.

19         Plaintiff argues, however, that the ALJ failed to acknowledge the medical evidence in the record

20  repeatedly references his significant fatigue, which led Dr. Kliewer to opine that such fatigue limited his

21  ability to do prolonged work.  First, plaintiff does not cite to any specific portions of the record showing

22  those repeated references to his significant fatigue.  To the extent that those references were his own self-

23  reports, furthermore, as discussed below, the ALJ properly discounted his credibility.  Second, while it is

24  true Dr. Kliewer made the above statement concerning fatigue in his late February 2003 opinion, there is no

25  indication in that opinion as to what Dr. Kliewer meant by "prolonged work."  See Tr. 220.  Further, to the

26  extent such a limitation could be quantified, Dr. Kliewer expressly found plaintiff would be restricted by his

27  impairments for only approximately six weeks, far less than the required period of time to establish

28  disability. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (impairment must last or be expected

1   to last for continuous period of not less than twelve months).

2         D.   <u>Dr. Lewis</u>

3       Lastly, plaintiff challenges the following step three finding made by the ALJ:

4       I find that the claimant's mental impairment caused only mild limitations regarding
        activities of daily living; moderate limitations regarding social functioning; mild
5      limitations regarding concentration, persistence, and pace; and there is no evidence in
        the record of episodes of decompensation of extended duration.  In making this finding,
6      I have found less drastic limiations [sic] in the claimant's social functioning than the
        opinion of the state agency, as the state agency's own opinion was not consistent with
7      the claimant's activities, including his attendance at narcotics anonymous meetings and a
        hepatitis C group, as well as the state agency's own opinion regarding the claimant's
8      mental residual functional capacity. EX. 5F. 11; 8F. 27, 31, 40; 6F.

9   Tr. 26.  Specifically, plaintiff asserts the ALJ's stated reasons for rejecting the state agency's opinion here

10  were too vague and thus improper.  The undersigned does find some merit in plaintiff's argument that the

11  ALJ's reliance on his participation in the above group meetings is questionable, as there is little indication as

12  to the frequency or extent of such participation.

13      The undersigned, however, also finds the ALJ's rejection of the marked social limitations contained

14  in the state agency opinion to have been proper.  The particular state agency opinion in question here was

15  provided by Janis Lewis, Ph.D., who completed a psychiatric review technique form in early July 2003,

16  finding that plaintiff had marked difficulties in maintaining social functioning. Tr. 184.  At the same time

17  though, Dr. Lewis also completed a residual mental functional capacity assessment form, in which she more

18  specifically found plaintiff's social interaction limitations to be in the mild to moderate range, with the

19  exception of his ability to interact appropriately with the general public. Tr. 189.  Dr. Lewis went on to

20  opine that plaintiff could "respond appropriately to supervisors, a small group of coworkers but not if in a

21  high stress situation," and that he could "not work with the public." Tr. 190.

22      These more specific social functioning limitations are generally consistent with the limitations the

23  ALJ included in his assessment of plaintiff's residual functional capacity concerning that area.  As such, the

24  ALJ did not err in rejecting the more general finding of Dr. Lewis contained in the psychiatric review

25  technique form indicating plaintiff was markedly limited in all social functioning areas.  Indeed, none of the

26  other medical sources in the record, including Dr. Haynes, found plaintiff to be markedly restricted in all of

27  those areas.  <u>See</u> Tr. 201, 225, 261.  Accordingly, although, as discussed above, the ALJ did err in

28  evaluating some of the medical evidence in the record concerning plaintiff's mental impairments, he did not

1    do so here at step three with respect to Dr. Lewis' opinion.

2    III.    The ALJ Properly Assessed Plaintiff's Crediblility

3            Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

4    639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

5    F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

6    based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

7    claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

8    as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th

9    Cir. 2001).

10           To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

11   disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

12   what testimony is not credible and what evidence undermines the claimant's complaints."  Id.; Dodrill v.

13   Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering,

14   the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at

15   834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811,

16   818 (8th Cir. 2003).

17           In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

18   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

19   testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

20   also may consider a claimant's work record and observations of physicians and other third parties regarding

21   the nature, onset, duration, and frequency of symptoms.  Id.

22           Here, the ALJ provided the following assessment of plaintiff's credibility:

23           I find the claimant credible to the extent that he alleged he would experience some
             limitations; the residual functional capacity finding above was, accordingly, reduced to
24           accommodate those limitations.  However, I cannot find the claimant's allegations that
             he was incapable of all work activity to be fully credible because of significant
25           inconsistencies in the record as a whole.  Specifically, the claimant alleged he could not
             work due to fatigue, which he attributed to diabetes and hepatitis C; however, his
26           diabetes was under reasonable control and his hepatitis C was noted to cause only
             shortness of breath. Ex. 14F. 3; 17F. 1.

27
             Further, the claimant has a history of substance abuse beginning in his childhood, which
28           appeared to precede his depression.  Despite numerous treatment programs and a three
             year period of sobriety, the claimant relapsed recently for two days on cocaine.  The

> record also indicates a possibility of malingering as evidence by the claimant's borderline performance upon testing. *See*, Ex. 10F. 9.
>
> I also note that the claimant's earning records indicate minimal earnings, indicating the claimant's difficulty with working may have pre-dated his alleged onset of claimed disabling impairments. Such a scenario is corroborated by the claimant's testimony at the hearing that he did not go back to work after substance abuse treatment because he "could not find a job."

Tr. 27. Plaintiff argues that these are not adequate reasons for rejecting his testimony, that his testimony was consistent with the reports of his physicians, and that the ALJ erred in finding that the only symptom of his hepatitis C was shortness of breath. The undersigned finds plaintiff's argument to be without merit, however, and upholds the ALJ's credibility determination.

A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). As noted above, the ALJ found that despite plaintiff's claim of inability to work due to fatigue from his diabetes, that disease was largely under control and his hepatitis C caused only shortness of breath. Plaintiff challenges this latter finding, but the objective medical evidence in the record, as opposed to his own self-reports, fails to support that challenge. Indeed, much of this evidence showed him to be asymptomatic. See Tr. 147-48, 209, 211-12, 214, 217, 230, 233, 237, 242, 246-47, 275-77, 283-84, 286, 289, 292, 338-39, 347-48. The record also supports the ALJ's finding that plaintiff's diabetes for the most part has been controlled. See Tr. 275, 286-89, 292, 299-300, 308.

While, as discussed above, Dr. Kliewer did find fatigue limited plaintiff's ability to do prolonged work, this was not linked to any particular impairment, nor was it found to be disabling in nature. Tr. 220. Dr. Kliever opined in early April 2003, that weakness and fatigue was "possibly associated" with plaintiff's chronic hepatitis. Tr. 169. He felt, however, that such weakness and fatigue could be due to his depression as well. Id. In late June 2005, furthermore, plaintiff specifically reported having "no significant symptoms" with respect to his hepatitis C, "except for shortness of breath with exertion." Tr. 338. Indeed, he went on to deny "any other significant problems since his last visit . . . more than a year ago," and reported that he tolerated "his normal usual activities without any significant problems." Id. As such, the ALJ did not err in discounting plaintiff's credibility due to inconsistencies with the medical evidence in the record.

The ALJ provided other valid reasons for discounting plaintiff's credibility as well. For example, the ALJ noted that the record indicated a possibility of malingering on the part of plaintiff. This finding is

1  supported by Dr. Wingate's observation that plaintiff's performance on psychological testing indicated he

2  may have been "engaging in negative impression management to make the point that he is disabled. Tr. 261.

3  She went on to specifically comment that there was "possible malingering" due to his "borderline

4  performance" on such testing. Tr. 267.  While this may not in itself be sufficient to constitute affirmative

5  evidence of actual malingering, it certainly has a negative bearing on his credibility.

6      Lastly, the ALJ pointed to plaintiff's earnings records indicating a history of minimal earnings, and

7  his testimony as to why he did not return to work after completing substance abuse treatment, as a basis for

8  further finding him to be not fully credible.  This too was proper.  See Smolen, 80 F.3d at 1284 (ALJ may

9  consider a claimant's work record).  Accordingly, the undersigned finds the ALJ provided sufficient and

10  valid reasons for discounting plaintiff's credibility, and thus did not err in doing so.

11  IV.    The ALJ's Step Five Analysis Was Improper

12      If the claimant cannot perform his or her past relevant work at step four of the disability evaluation

13  process, at step five, the ALJ must show there are a significant number of jobs in the national economy the

14  claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-

15  (e).  There are two ways that the ALJ can to this: "(a) by the testimony of a vocational expert, *or* (b) by

16  reference to the [Commissioner's] Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2"

17  (the "Grids"). Tackett, 180 F.3d at 1100-1101 (emphasis in original); see also Osenbrock v. Apfel, 240 F.3d

18  1157, 1162 (9th Cir. 2001).  The ALJ's ability to rely on the Grids is limited, however, as noted by the Ninth

19  Circuit in describing their purpose and function:

20          In some cases, it is appropriate for the ALJ to rely on the Medical-Vocational Guidelines
21          to determine whether a claimant can perform some work that exists in "significant
            numbers" in the national economy.  The Medical-Vocational Guidelines are a matrix
22          system for handling claims that involve substantially uniform levels of impairment. . . .

23          The Guidelines present, in *table form*, a short-hand method for determining the
            availability and numbers of suitable jobs for a claimant.  These tables are commonly
24          known as "the grids."  The grids categorize jobs by their physical-exertional
            requirements and consist of three separate tables-one for each category: "[m]aximum
25          sustained work capacity limited to sedentary work," "[m]aximum sustained work
            capacity limited to light work," and "[m]aximum sustained work capacity limited to
26          medium work."[6] . . . Each grid presents various combinations of factors relevant to a
            claimant's ability to find work.  The factors in the grids are the claimant's age,
27          education, and work experience.  For each combination of these factors, . . . the grids

28
    _____
        [6]However, "[I]f a claimant is found able to work the full range of heavy work this is 'generally sufficient for a finding
    of not disabled.'" Tackett, 180 F.3d at 1101 n.5 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00).

ORDER
Page - 15

direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements.

This approach allows the Commissioner to streamline the administrative process and encourages uniform treatment of claims. . . .

The Commissioner's need for efficiency justifies use of the grids at step five where they *completely and accurately* represent a claimant's limitations. . . . In other words, a claimant must be able to perform the full range of jobs in a given category, i.e., sedentary work, light work, or medium work.

Tackett, 180 F.3d at 1101 (emphasis in original) (internal citations and footnote omitted).

If, on the other hand, a claimant has "significant non-exertional impairments," those impairments "may make reliance on the grids inappropriate."[7] Id. at 1101-02; see also Osenbrock, 240 F.3d at 1162 (ALJ cannot rely on Grids where claimant has significant non-exertional impairments); Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (Grids inapplicable when they do not completely describe claimant's abilities and limitations).  Proper use of the Grids depends in each case upon the nature and extent of the claimant's impairments and limitations:

The ALJ must apply the grids if a claimant suffers only from an exertional impairment . . . In such cases, the rule is simple: the grids provide the answer.  Where the grids dictate a finding of disability, the claimant is eligible for benefits; where the grids indicate that the claimant is not disabled, benefits may not be awarded.  However, where a claimant suffers solely from a nonexertional impairment . . . the grids do not resolve the disability question . . . other testimony is required.  In cases where the claimant suffers from both exertional and nonexertional impairments, the situation is more complicated.  First, the grids must be consulted to determine whether a finding of disability can be based on the exertional impairments alone. . . . If so, then benefits must be awarded.  However, if the exertional impairments alone are insufficient to direct a conclusion of disability, then further evidence and analysis are required.  In such cases, the ALJ must use the grids as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." . . . In short, the grids serve as a ceiling and the ALJ must examine independently the additional adverse consequences resulting from the nonexertionary impairment.

Cooper v. Sullivan, 880 F.2d 1152, 1155-56 (9th Cir. 1989) (internal citations and footnotes omitted).

Here, as noted above, the ALJ determined plaintiff was capable of performing other jobs existing in significant numbers in the national economy, finding specifically in relevant part as follows:

Born on October 30, 1962, the claimant is currently 43 years old.  This is defined in the regulations as a younger individual. 20 C.F.R. §§ 404.1563, 416.963.  He has a limited education and no transferrable skills since the claimant is limited to unskilled work.

_____

[7]"Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b).  "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

. . . The occupational base for light and sedentary unskilled work encompasses 1,600 occupations, and each occupation represents numerous jobs in the national economy. Social Security Ruling 85-15p.  Since it has been determined above that the claimant can perform light work, the remaining question is whether the claimant's reduced mental capacity erodes this occupational base.

Social Security Ruling 85-15 states that "the basic mental demands of competitive, remunerative unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling 85-15p.

I do not find the claimant's limitations . . . significantly erode the occupational base represented by unskilled light and sedentary work, and therefore find that that [sic] the claimant is able to make and [sic] adjustment to work that exists in significant numbers in the national or regional economy.

For example, the state agency determined that the claimant could work as a cleaner, housekeeper . . . , photocopying-machine operator . . . , and a collator operator . . . , which are all light unskilled jobs. Ex. 8E. 2.  Thus, a finding of "disabled" may be reached within the framework of medical-vocational rule 202.17, and in accordance with Social Security Ruling 85-15.

Tr. 29-30.

Plaintiff argues the ALJ erred in failing to find the many moderate to marked mental functional (i.e., non-exertional) limitations he was noted to have by the medical sources in the record to be significant, thus requiring the ALJ to obtain further evidence of his ability to perform other jobs through the testimony of a vocational expert.  The undersigned agrees.  As discussed above, the ALJ failed to properly evaluate all of the medical evidence in the record concerning plaintiff's mental impairments.  Much of that evidence shows that plaintiff was found to have significant mental functional limitations.  Indeed, the assessment of plaintiff's residual functional capacity the ALJ provided itself contains significant non-exertional mental limitations, such as being away from the public in a setting not involving high stress.  These are not mental limitations contemplated by the Grids, and thus likely significantly erode the occupational base.  The ALJ erred, therefore, in failing to call a vocational expert to testify.

V.      Remand for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national

economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because, as discussed above, issues still remain regarding the nature and severity of plaintiff's mental functional limitations and his ability to perform other jobs existing in significant numbers in the national economy, this matter hereby is remanded to the Commissioner for further administrative proceedings.

Plaintiff argues that because the ALJ provided inadequate reasons for rejecting the opinions of his treating physicians, those opinions should be credited as true.  The undersigned disagrees.  It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted).  However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit  "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116.

Here, first of all, as discussed above, the ALJ did not err in his evaluation of the medical evidence in the record concerning plaintiff's physical impairments, including those from his treating physicians.  In addition, while, also as discussed above, the ALJ did err in evaluating the medical evidence in the record regarding his mental impairments, it is not clear the ALJ would be required to adopt all the limitations the medical sources in record found stemmed therefrom.  Indeed, these sources do not appear to be in complete agreement as to the nature and severity of those limitations.  Finally, as no vocational expert testimony has been obtained, remand for an award of benefits is inappropriate for this reason as well.

1

<u>CONCLUSION</u>

2          Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff was not

3  disabled.  Accordingly, the ALJ's decision hereby is REVERSED and REMANDED to the Commissioner

4  for further administrative proceedings in accordance with the findings contained herein.

5          DATED this 29th day of June, 2007.

6

7

8                                                          Karen L. Strombom
                                                           United States Magistrate Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 19